The construction contended for by the respondent would make that which is an absolute, unqualified acceptance upon its face, a conditional one by reference to a letterhead which was not referred to by either party.' "

It seems from the reasoning expressed herein that the defendants having failed to call the plaintiffs' attention to the printed matter in said proposal or contract, and as no evidence upon the trial herein was introduced to the contrary, and the defendants failing to support their answer herein, I fail to see wherein I can do otherwise than direct a verdict in favor of the plaintiffs for the sum of $521.26, with interest thereon, making a total sum of $529.08. Settle order on one day's notice.

(94 Misc. Rep. 118)

HILL STEAMBOAT LINE v. NEW YORK CENT. & H. R. R. CO. et al.

(City Court of New York, Trial Term.   February 2, 1916.)

1. INDEMNITY ⊚⟳15(10)—LOSS OR INJURY TO FREIGHT—CONNECTING CARRIERS —ACTIONS BY INITIAL CARRIERS FOR REIMBURSEMENT.

Interstate Commerce Act Feb. 4, 1887, c. 104, § 20, 24 Stat. 386, as amended by Act June 29, 1906, c. 3591, § 7, 34 Stat. 593 (U. S. Comp. St. 1913, § 8592), providing that an initial carrier shall be entitled to recover from the connecting carrier on whose line the loss, damage or injury shall have been sustained, the amount it may be required to pay to the owners of such property authorizes a determination, in an action by an initial carrier against the connecting carrier for the loss of property, of the ultimate liability for the loss, and a judgment for the initial carrier directly against whichever of the connecting carriers is to be deemed chargeable inter se for the loss of the property.

[Ed. Note.—For other cases, see Indemnity, Cent. Dig. § 46; Dec. Dig. ⊚⟳15(10).]

2. CARRIERS ⊚⟳118—LOSS OF FREIGHT—CONNECTING CARRIERS—ACTIONS INTER SE—AGENTS.

In an action by an initial carrier against connecting carriers for property lost, where a connecting carrier employed a truckman to transport goods from the intermediate carrier to its piers, it is as fully responsible for the acts of the truckman and his employés in dealing with the property delivered to them as though such acts were those of its own officers or staff; the rights and liability of the carriers inter se remaining unaffected by the rights of a carrier against its agent.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 492, 517–519; Dec. Dig. ⊚⟳118.]

3. CARRIERS ⊚⟳174—CONNECTING CARRIERS—ACTIONS INTER SE—EFFECTIVE CUSTOM.

Although a custom or usage between connecting carriers does not bar the rights of the owner or initial carrier to reimbursement, in an action involving only the rights of two connecting carriers inter se, each carrier is necessarily bound by a usage or custom they together have established to facilitate the transfer of freight from the intermediate to the connecting carriers.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 747–765; Dec. Dig. ⊚⟳174.]

4. CARRIERS ⊚⟳174—CONNECTING CARRIERS—ACTIONS INTER SE—ESTOPPEL TO DENY USAGE.

Where two connecting carriers have between themselves made presentation of a receipted freight bill, the sole and uniformly accepted evidence of the rights of the connecting carriers to receive possession of goods on

⊚⟳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

the delivery platform of the intermediate carriers, and a loss was sustained through fraud or theft, neither may be heard to reject the usage, or maintain that the loss should not be borne by the carrier whose employé was guilty of the unexplained loss or conversion of the receipted bill, which enabled some person to commit the theft.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 747–765; Dec. Dig. ☞174.]

5. ESTOPPEL ☞75—GROUNDS—DELIVERY OF SYMBOL OF OWNERSHIP.

Where one entitled to receive possession of property has, by the misfeasance or negligence of his own employés as to the safe-keeping of a "symbol of ownership," put it into the power of another to occupy his position ostensibly, and thereby enabled the other to gain a wrongful possession, the person whose employés are at fault is estopped from asserting his right against the one who by such fault has been induced to surrender possession.

[Ed. Note.—For other cases, see Estoppel, Cent. Dig. §§ 192–195; Dec. Dig. ☞75.]

Action by the Hill Steamboat Line against the New York Central & Hudson River Railroad Company and another. Judgment for plaintiff, against defendant Panama Railroad Company.

Stetson, Jennings & Russell, of New York City (William C. Cannon and J. Howland Auchincloss, both of New York City, of counsel), for plaintiff.

Alex. S. Lyman, of New York City (William Mann, of New York City, of counsel), for defendant New York Cent. & H. R. R. Co.

Richard Reid Rogers, of New York City (Jacob Marx, of New York City, of counsel), for defendant Panama R. Co.

RANSOM, J. The verdict directed upon the trial in favor of the plaintiff against the defendant Panama Railroad Company may stand. The action involves practices, the course of dealing, and modes of expediting business, employed by freight carriers inter se; and the issue, while adjudicated in no decision disclosed by the considerable research of counsel, is not lacking in importance, as well as difficulty, in view of the actual conditions under which great volumes of freight, billed over so-called "through routes" on "through" bills of lading, are handled in transit by the successive carriers. No right of consignor or consignee of goods is here at stake, and no issue as to the duty of a common carrier to the public. The firm to which the goods were consigned has been fully compensated by the plaintiff, pursuant to due judgment, for their nondelivery, and it is the sum so paid to the consignee which the initial carrier seeks in this action to recover from the subsequent carrier legally chargeable for the break in the sequence of safe transportation. The Hill Steamboat Line concededly delivered the eight cases of brass faucets and pipe connections to the Michigan Central Railroad Company at Chicago. The last-named carrier concededly delivered the property to the New York Central & Hudson River Railroad Company (herein for convenience referred to as the New York Central) at Buffalo. The Panama Railroad Company was to receive the property at the St. John's Park station of the New York Central, transport the same by truck to its pier in the port of

New York, and thence by ship and rail to Panama, where the same was to be turned over to the California-Atlantic Steamship Company for carriage and delivery to the consignee in Los Angeles, Cal. The California-Atlantic Steamship Company concededly never received the property from the Panama Company. The latter and the New York Central were accordingly named as defendants by the initial carrier, and determination is here asked as to which defendant should make the reimbursement to which the initial carrier is indisputably entitled.

[1] The action is brought under the provisions of section 20 of the Interstate Commerce Act, which explicitly provides that the initial carrier "shall be entitled to recover from the common carrier, railroad, or transportation company on whose line the loss, damage, or injury shall have been sustained the amount of such loss, damage or injury as it may be required to pay to the owners of such property, as may be evidenced by any receipt, judgment, or transcript thereof." The initial carrier accordingly is entitled here to judgment directly against whichever of the connecting carriers is to be deemed legally chargeable, inter se, for the loss of the property. The statute was expressly framed to give to a court of law jurisdiction of an action brought directly against the responsible carrier or carriers, and to relieve this plaintiff, for example, from the necessity of circuitously seeking reimbursement in the first instance from the Michigan Central, or even from the New York Central alone, if it should appear that, under the course and mode of business operative between the New York Central and the Panama Company, the former had done all that the latter had commonly recognized as transferring to it the responsibility for the continued safe carriage of the property. Where the initial carrier sues the connecting carriers, between whom unquestionably rests any issue of responsibility for nondelivery, section 20, remedially and sensibly construed, authorizes the determination in that action of the ultimate liability for the loss.

[2] The facts as to the shipment, which left the possession of the New York Central, but which the Panama Company did not deliver to the steamship company, were undisputed. Many of the facts were stipulated; the remainder were adduced from witnesses who testified with refreshing regard for accuracy of detail. The eight cases came down in car No. 99785 to the New York Central's St. John's Park depot, at Laight and Varick streets, in the borough of Manhattan. The New York Central thereupon duly sent to the Panama Company, as the carrier next in the sequence named in the through routing, the usual form of notice of the arrival at that station of certain goods, whose nature, consignee, destination, etc., were named therein. This notice of arrival showed certain freight charges unpaid, and it was indorsed, on the back thereof:

"Deliver to Panama Line upon payment of charges.
          "Walter R. Pollock, Mgr. F. F. Dept. B."

The physical performance of its duty of obtaining from the New York Central and transporting to its piers property to be carried by its ships, the Panama Company had habitually delegated to a truckman,

W. T. Haring, who was its regular truckman and agent for that purpose. Haring appears to have been in fact that company's only authorized truckman, and for the acts or omissions of Haring, or any of his employés, the Panama Company is of course as fully responsible here as though such acts or omissions were those of its own officers or staff. Delivery to any of Haring's employés was delivery to the Panama Company, regardless of whatever that employé subsequently did with the goods. Rights and liabilities of the carriers inter se remain unaffected by rights of the Panama Company against its agent.

As between the two carriers and Haring, a definite course of dealing, an accustomed mode of expediting the business and handling "through" freight, had indisputably come into being, based upon the practice in a multitude of instances, of all of which the two carriers and Haring had full knowledge. With such knowledge, for reasons sufficient unto themselves, they continued to handle the business according to this uniform usage and course. When a notice of arrival came in, the Panama Company would send it to Haring. The latter would stamp on the back of the notice his name, address, custom house license number, and certain numbers of trucks, presumably those for which he had obtained municipal licenses. Haring would then turn the notice over to one of his men, who would go to the station, present and surrender the notice of arrival, pay the charges, and obtain therefor a receipted freight bill, which was a carbon copy of the typewritten portions of the arrival notice as originally sent, to which the cashier's stamp would be attached in certification of payment. Neither Haring's stamp, as above described, nor any similar indorsement, was ever placed on the receipted freight bill, by Haring's employé or by the cashier; but the receipted bill was taken out on the platform by him to whom it was delivered, the goods were located and placed on a truck, and the receipted bill was retained by the person presenting it. By the known course of handling the business as between the two carriers and Haring, the receipted freight bill was used as evidence of right to receive possession, the sole paper to be produced on the delivery platform when "through-billed" freight destined to continue over the line of the Panama Company was to be taken from the possession of the New York Central. It does not appear that information as to Haring's truck numbers, or as to the identity or authority of truckmen presenting Haring's receipted bills, was ever brought to the attention of the delivery clerk.

The accustomed course seems to have been followed as to the eight cases in controversy. Haring stamped the arrival notice and gave it and the money to an employé. The latter presented and surrendered this along with several similar notices, paid by Haring's check the aggregate charges accrued on the shipments covered by the several notices, and obtained receipted bills. The bill for the eight cases was taken out on the platform and handed to the delivery clerk. Haring's employé had not placed thereon Haring's stamp or Haring's truck numbers. The arrival notice had been indorsed for delivery upon payment of charges, and the receipted bill showed that all charges had been paid. As customary, the surrender of the arrival notice and display of the receipted bills were treated as sole evidence of the propriety

of parting with possession. The goods were placed on a truck and taken away by the person presenting the receipted bill. He signed the carrier's receipt with the name of "Frank Wilson," and the evidence indicates that no person of that name was then employed by Haring. It cannot be said that competent evidence shows indisputably that the person presenting the bill and signing the name of Wilson to the carrier's receipt for delivery was the employé who brought to the cashier this arrival notice, along with others and Haring's check. The number of the truck on which the goods were taken away was not one of those stamped by Haring on the arrival notice presented to the cashier, and Haring had at that time no truck No. 281 registered in his service. If the person who signed the name Wilson and took away the goods was not the one who paid the charges and obtained the receipted bill, and if he was not an employé of Haring at all, the record is silent as to his identity, and silent likewise as to the manner in which he gained possession of a receipted freight bill which in the usual course the employé receiving it for Haring would have taken immediately from the cashier to the delivery clerk on the freight platform.

The Panama Company, Haring, and Haring's employés alike afford no explanation of the manner in which, if at all, this important piece of paper, which by unvarying usage in a multiplicity of instances had been the only evidence or symbol of the right to receive possession ever presented on the delivery platform, passed on this particular day from the possession of that one of Haring's employés who would in the ordinary course have promptly used it in obtaining possession of the goods for the Panama Company. What, if anything at all, befell this receipted bill, and where the bill is now, remains unexplained by those in whose custody it was, those who knew that by a long course of dealing, set up for the mutual convenience of these carriers, no other paper need or would be presented or act done on the delivery platform for the New York Central to yield up possession of the goods in transit. There is no indication that anything befell the other receipted bills delivered to Haring's employé at the same time, or that the goods evidenced by those bills were not properly transferred to the connecting carrier. If the bill for the eight cases was lost or stolen, no information of that mishap was given to the New York Central then, so as to head off misdelivery nor is any such information or explanation afforded now. It is obvious that the Panama Company is fully chargeable here with any fault on the part of any of Haring's employés in losing the receipted bill, or any misfeasance on the part of such employé in giving the bill to some unauthorized person, or in himself signing a fictitious name on receiving the goods and then converting them. Upon the Panama Company likewise rests any consequences of failure to explain the loss or theft of the bill, if it was lost or stolen, or the larceny of the goods, if the person who received them was in fact a person authorized to receive them for Haring.

[3] The New York Central Company here contends that it yielded possession of the goods in precisely the manner and upon the production of the identical evidence of right to receive delivery for the Panama Company, which was sanctioned by the long and mutually well-

known course of dealing almost necessarily set up by the two carriers for their own mutual convenience in the handling of "through" freight; that the New York Central was fully justified in proceeding in the manner sanctioned by long usage; that upon the state of facts disclosed the unexplained misfeasance or fault was that of one of Haring's men, and so of Haring and the Panama Company; and that, with this burden unfulfilled, Haring and the Panama Company cannot now be heard to claim, in a suit under section 20, that a delivery made in the prescribed mode was not, as against the Panama Company, a delivery to it, in such sense as to relieve the New York Central from liability. There is substantial merit in these contentions. In an action involving only the rights and liabilities of the carriers between themselves, each carrier is necessarily bound by whatever usage and custom they together have established, to facilitate the transfer of freight from the intermediate to the connecting carrier. Moore on Carriers (2d Ed.) vol. 2, §§ 21, 22; Forbes v. Fitchburg R. R. Co., 133 Mass. 154.

[4] To hold that, whenever loss occurs, the intermediate carrier, which has yielded possession only in the manner sanctioned by the usage long prevalent in its dealings with the connecting carrier, must nevertheless bear the loss, unless the intermediate carrier can affirmatively show in detail that its employés observed all the rules laid down by historic precedents governing delivery by carriers to purported owners or consignees, would be to ignore the obvious necessities of present-day transportation under through routing. Such adjustments and usages could not, of course, bar the owner's right, or the initial carrier's right, to reimbursement; but as to liability inter se both the carriers are bound. These two carriers had, as between themselves, made presentation of the receipted freight bill the sole and uniformly accepted evidence of right to receive possession on the delivery platform, and where question arises as to which must bear a loss sustained through fraud and theft, neither may be heard to reject the usage or maintain that the loss should not be borne by the carrier whose employé committed the theft of the goods or whose employé was guilty of the unexplained loss or conversion of the receipted bill which enabled some third person to commit the theft. If the conversion of the goods was not by a person in fact employed by Haring, at least it is true that one of Haring's employés either converted or lost the receipted bill which the familiar usage of the parties had made the sole symbol, evidence, or token of the right to receive possession, and then kept silent, during the day intervening, when information of the loss or theft of the paper would have halted delivery. The Panama Company, through Haring, has failed to show that the latter's employé did not receive the goods and convert them, or that his employé did not give the receipted bill to some authorized person, or that Haring's employé did not part with its possession through sheer carelessness, and this failure is in the face of the fact that Haring and his employés are in far better position to adduce proof upon the subject. Berkowitz v. C., M. & St. P. R. R. Co., 109 App. Div. 878, 96 N. Y. Supp. 825.

[5] Under analogous principles, the strongest inferences of misfeasance or negligence on the part of Haring's employés would seem

to be operative here, in view of the entire absence of proof of their careful custodianship of the paper or explanation from them as to what, if anything, befell it as the accustomed evidence of right to receive delivery. Fairfax v. N. Y. C. & H. R. R. Co., 67 N. Y. 11; Hasbrouck v. N. Y. C. & H. R. R. Co., 202 N. Y. 363, 95 N. E. 808, 35 L. R. A. (N. S.) 537, Ann. Cas. 1912D, 1150. Likewise, under the familiar rules laid down in cases involving warehouse receipts and bills of lading, where the person entitled to receive possession has, by the misfeasance or negligence of his own employés as to the safe-keeping of such "symbol of ownership," "put it into the power of another to occupy his position ostensibly," and thereby has enabled that other to gain a wrongful possession, the person whose employés are at fault is estopped from asserting his right against the one who by such fault and ensuing failure to notify has been misled and induced to surrender possession. Friedlander v. Texas, etc., Ry. Co., 130 U. S. 416, 424, 9 Sup. Ct. 570, 32 L. Ed. 991; Raleigh & G. R. Co. v. Lowe, 101 Ga. 320, 28 S. E. 867; Ewart on "Estoppel," p. 346 et seq. In the absence of explanation from the Panama Company through Haring, the Panama Company cannot be heard here in repudiation of the established course of dealing, or in assertion that the person who received the goods was not one of Haring's employés or a person acting in connivance with such employé.

The various motions made at the close of the trial are accordingly denied. Submit an order upon one day's notice.